Jones, Chief Judge,
with whom Littleton, Judge {Bet.) joins,
concurring in part:
Since our finding 53 establishes the fact that plaintiff did not report as income the amount it ultimately realized from the disposition of the flower marks, the sum so realized should be deducted from any recovery that is allowed for the loss incurred. The loss was sustained and the deduction is sought for the year 1945.
The marks which plaintiff had received were actually used for the payment of expenses during the four subsequent years. Since in those subsequent years plaintiff was no longer in the flower business, the marks were manifestly used in the payment of expenses that were in no way connected with the flower business out of which the claimed loss arose.
The plaintiff reported the interest on the Deutsche mark balances. This interest was included by plaintiff in reporting its gross income for Federal tax purposes, but it apparently did not report as income the finally realized value of the marks themselves.
I can see no valid reason why the Government should not be permitted to recoup the amount the plaintiff finally realized on the disposition of these marks in the payment of obligations that were related in no way to the business in connection with which the claimed loss was incurred.
The plaintiff must show the amount realized directly or indirectly from these marks in order to establish the net loss it sustained.
*792 Unless plaintiff is able to show that it reported its income from the area involved for the four years mentioned and in reporting such income for the same period did not take as a deduction the expenses that were settled by the use of the marks, the recoupment or offset should be allowed. The burden is on the plaintiff to make this showing, otherwise the amount it ultimately received even though received in later years should be taken into consideration in now making refund for loss in the year 1945, and the entire matter thus adjusted on a basis that is fair to both sides.
BINDINGS OF FACT
The Court, having considered the evidence, the report of Trial Commissioner S. E. Gamer, and the briefs of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation duly organized and existing under the laws of the State of Delaware, with its principal office in New York City. It is a common carrier engaged in foreign and overseas radio telegraph communications service and is subject to the jurisdiction of the Federal Communications Commission (hereinafter sometimes referred to as the “FCC”).
2. At all times mentioned herein plaintiff kept its books and filed its Federal income and excess profits tax returns on the calendar year accrual basis.
3. Plaintiff duly filed with the Collector of Internal Eev-enue for the Third District of New York (hereinafter referred to as the “Collector”) its excess profits tax return for 1945, on the accrual basis, showing excess profits tax due in the amount of $4,359,990.20. During 1946 and 1947, plaintiff paid to the Collector a total of $4,456,312.06, of which $96,241.86 was transferred to plaintiff’s income tax account for 1945 on October 29,1947, and $80 was refunded to plaintiff on or about February 19, 1952.
4. In May 1952, the Commissioner of Internal Eevenue, (hereinafter referred to as the “Commissioner”) assessed against plaintiff a deficiency in excess profits tax for 1945 in the amount of $46,301.18, together with interest thereon in the amount of $10,531.67, or a total of $56,832.85,. which was paid by plaintiff to the Collector by way of credits to *793 plaintiff’s account in the amount of $10,531.67 and a payment in the amount of $46,301.18, during 1952.
5. Within three years from the time plaintiff’s income tax and excess profits tax returns for 1945 were filed, the Commissioner and plaintiff executed an agreement under section 276(b) of the Internal Revenue Code extending the period of assessments of taxes of plaintiff for said year. The Commissioner and plaintiff entered into timely extensions of such agreement, the last of which extensions expired on June 30, 1952.
6. On July 7, 1950, plaintiff filed with the Collector a claim for refund of $224,197.03 of excess profits tax which plaintiff had paid for 1945.
7. By registered letter dated April 10, 1952, the Commissioner disallowed in full the claim for refund referred to in finding 6.
8. This action was commenced on May 20, 1953, less than two years from the date of mailing by registered mail by the Commissioner of the disallowance referred to in finding 7.
9. Prior to World War II, three American radio telegraph companies, including plaintiff, had conducted commercial communications with Germany (and with other European countries). None of them owned or operated any transmitting or receiving facilities either in Germany or elsewhere in Europe, since such facilities were owned or operated by a government agency or private communications companies organized under the laws of the European country concerned, including Germany. However, they did maintain offices, together with commercial representatives, in such European countries. Such offices did not handle traffic as carriers but maintained liaison with the local companies and generally sought to stimulate traffic that would ultimately be handled by plaintiff at the United States end of the circuit. These operations had been terminated and the offices closed by reason of World War II. Prior to World War II, transmitting and receiving facilities in Germany and elsewhere in Europe, owned and operated as indicated above, were operated in conjunction with the operations of one or more of the three American radio telegraph companies, including plaintiff, where communication was *794 from or to a point in the United States or some other country served by such companies.
10. On November 22, 1944, the Joint Chiefs of Staff requested the Board of War Communications to make the necessary arrangements leading to the establishment of commercial communications channels between the United States and Germany. The Board in turn, under its procedures, requested the FCC to designate an American communication company or companies to provide the facilities and personnel for the establishment of communication channels between the United States and Germany.
11. Pursuant to the Board’s request, the FCC named the plaintiff and the two other companies, Mackay Radio and Telegraph Company, and Press Wireless, Inc., which had previously furnished service to Europe as above described, and so advised the Board. On November 23, 1944, the Board advised the Joint Chiefs of Staff that the Board had designated plaintiff and the two other companies to make the necessary arrangements leading to the establishment of commercial communications channels and further advised that the FCC had indicated that plaintiff and the two other companies would be licensed to provide the necessary eastbound circuits connecting with their circuits in Germany. Thereafter, plaintiff was so advised.
12. Plaintiff could have declined to establish such a communication channel between the United States and Germany. However, in the opinion of its management, to decline would have been to risk granting a competitive advantage to its two American competitors in the re-establishment of postwar commercial communications with Europe, including Germany. Accordingly, on February 9, 1945, plaintiff applied to the FCC for a license, in which it described the “service to be rendered” as the—
handling of all classes of public correspondence including Government telegrams, press and contact control in connection with program and radiophoto reception services. Authorization is desired for the period specified so that applicant may be prepared to render the service contemplated by military authorities in the European theater pursuant to instructions issued by that military control to the European manager of *795 R.C.A. Communications, Inc., promptly when conditions warrant.
The FCC extended a special temporary authorization on March 5, 1945, effective March 9, 1945, to plaintiff to operate as above stated on plaintiff’s application.
13. The Joint Chiefs of Staff and the Board of War Communications authorized certain United States commercial companies, including the plaintiff, to “install a radio station and operate a direct circuit with the United States in order to handle press, facsimile, EFM, [Expeditionary Force messages] and any other commercial traffic permitted and censored by military authorities,” it being further provided that this procedure should be effected “as soon as practicable after occupation of a country by United States Forces, alone or in conjunction with Allied Forces.”
14. Plaintiff established and operated with expectation of profit a radio station in Berlin commencing on July 25, 1945.
15. Plaintiff’s operation of its stations in Europe, including the station at Berlin, ceased in January, 1948, when plaintiff resumed its prewar 'activities of maintaining commercial representation in Germany which continues to the present time. At no time has plaintiff before or after World War II engaged in any business activity in Germany other than to solicit routing of messages originating in Germany via plaintiff to destinations where plaintiff operates receiving facilities.
16. Commencing on July 25, 1945, plaintiff began the transmission of Expeditionary Force messages (EFM), senders composition messages (SCM) and press traffic from its Berlin radio station. Commencing on or about September 1, 1945, it began similar transmissions from its Nürn-berg station, a mobile station that communicated with the United States.
17. During the part of 1945 that plaintiff’s Berlin radio station was in operation, no one other than Allied military personnel and authorized Allied civilians was permitted to make use of plaintiff’s facilities in Germany.
18. At the time plaintiff’s Berlin radio station commenced operations, a military directive provided that messages *796 (other than press messages, which were sent collect) utilizing plaintiff’s facilities were to be sent by a military officer attached to each Army unit who was responsible for accepting such messages from the men in his unit. This officer was to obtain postal money orders in payment for the messages and forward such messages with the money orders to the transmitting communications companies.
19. Prior to the commencement of operations by plaintiff’s radio station in Berlin, a competing communications company, Mackay Eadio and Telegraph Company, opened a number of branch offices in Eed Cross and Service Clubs in Berlin where personal radiograms were accepted over the counter from authorized military personnel, with Allied military marks being accepted in payment and the Company being permitted at the end of the day’s business to purchase a postal money order with the marks. Although this procedure was not authorized by the outstanding directive referred to in finding 18, it was nevertheless put into effect at the suggestion and upon the authorization of the Postal Officer of the Army’s Berlin District Headquarters and his superiors in the Postal Division who felt that the maintenance of such branch units by the communications company would serve the convenience of the military personnel and result in expediting the delivery of the messages. When plaintiff commenced its operations in Berlin, it was similarly advised by said Postal Officer to adopt the same method, and plaintiff did so. Thus, messages (other than press messages) were paid for in Allied military marks. Plaintiff assumed it would be able to transfer the Allied mark receipts to the United States, as they accumulated from the conduct of their transmission service, by the purchase of postal money orders.
20. (a) During the part of 1945 in which plaintiff’s Berlin radio station was in operation the only valid currency in Germany for Allied military personnel and civilians authorized to use plaintiff’s radio communications service was the Allied military mark. All messages and services paid for directly in Germany were paid for in such marks.
(b) The Allied military mark was an occupation currency issued under the general authority of the President of the *797 United States 'as Commander in Chief of the Army and Navy. The Treasury Department of the United States printed in the United States a certain quantity of the marks, which were delivered to the War Department.
(c) The Allied military marks were not United States currency. They were issued by the Allied military authorities in Germany. The game mark currency was used by all four of the Allied Occupying Powers in Germany. Large quantities of these marks were printed by the Union of Soviet Socialist Eepublics from plates supplied by the United States. Under a military directive from the Combined Chiefs of Staff, they were legal tender for the Germans and for the Allies, and for use by United States Forces in authorized United States facilities and in the German economy. They were interchangeable on a one-for-one basis with the reichsmarks in the German economy.
(d) Military regulations and directives controlled the methods by which the marks could be used or spent in Germany. On June 5, 1945, currency controls and measures were adopted by Headquarters, European Theater of Operations, United States Army, for the purpose, among others, of preventing the transmission and conversion of Allied military marks and of funds unlawfully secured by military personnel. Allied military personnel and authorized Allied civilians in Germany, including plaintiff and plaintiff’s representatives, were at all times subject to the authority and control of their respective Allied military commanders and not to the general Allied Military Government for Occupied Germany. The Financial Division of Military Government was given control over all funds used by the United States Military and Naval Forces in Germany.
(e) The Allied Occupying Powers did not establish any general rate of exchange between the Allied military mark currency and the dollar. A conversion rate of 10 marks for one United States dollar was established for military purposes, including payment of troops stationed in Germany and military accounting. The same conversion rate was adopted by all the occupying powers on an approximately equivalent basis in terms of their currencies.
*798 (f) There was no legal obligation on tbe part of the United States or any of the other occupying powers to redeem, as distinguished from convert, the Allied military marks. Such obligation was to be the responsibility of the German Government. The Four Powers in the Allied Control Council agreed among themselves on September 20, 1945, that the German Government would be responsible for and would redeem Allied military marks as part of the occupation costs. This “Quadripartite Arrangement for Control of Germany by Allied Eepresentatives, Berlin,” provided in part:
The German authorities will supply free of cost such German currency as the Allied Eepresentatives may require, and will withdraw and redeem in German currency, within such time limits and on such terms as the Allied Eepresentatives may specify, all holdings in German territory of currencies issued by the Allied Eepresentatives during military operations or occupation, and will hand over the currencies so withdrawn free of cost to the Allied Eepresentatives.
From the time of Germany’s unconditional surrender to the end of 1945, there was no central German authority in Germany or an existing independent German Government. Sovereign power had been assumed by the Allied Occupying Forces and directives then in effect prohibited the creation or development of a central German Government. It was not possible to tell at that time what the status or nature of the future German Government, if any, would be, or when such a Government would come into being.
(g) On October 12,1945, the Office of the Fiscal Director, Headquarters, Theater Service Forces, European Theater, issued a Currency Directive (Changes No. 10, Finance Circular Letter #80), which provided in part as follows:
2. Until further notice, the transmission of funds which have not been derived from U.S. Official sources to any point outside the theater or conversion of funds which have not been derived from U.S. Official sources, by all personnel in this theater subject to U.S. military law who enjoy the privileges of either the Army or Navy finance or postal facilities or who purchase War Bonds for cash from either Army or Navy agencies, is prohib *799 ited. The utilizing for such transmission or conversion means other than those afforded by U.S. Army or Navy Finance officers, Army or Navy war bond officers, or through the Army or Navy postal service is also prohibited.
3. The provisions of paragraph 2, above, will be implemented as follows:
a. All field grade officers and all civilians who. hold assimilated rani of field grade and above, will, prior to every transmission of funds to the U.S. via Army or Navy finance officers, Army or Navy war bond officers or through Army or Navy postal services, execute and submit to the agency concerned the following certificate:
“I certify that these funds sought to be transmitted via (Personal Transfer Account) (Money Order) (War Bond) (et cetera) were derived only from United States official sources.”
Such certificate will be legibly signed and the grade, serial number or comparable civilian designation furnished, together with complete address and APO number.
b. All military personnel (excluding officers of field grade and above) and all civilians who have no assimilated rank and those who have assimilated rank up to and including company grade desiring to deposit money in Soldiers Deposits or to transmit funds by personal transfer account, postal money order, or by purchase of war bonds, will submit applications in suitable form to the appropriate commander, who is charged with assuring himself that the funds sought to be transmitted by the applicants concerned were derived only from U.S. official sources. Such commander is thereafter charged with causing approved applications to be transmitted to the agency responsible for final processing thereof, together with appropriate evidence of such approval.
c. Conversion (exchange) of currencies will be accomplished only by Army or Navy finance officers and under procedures established by the Theater Fiscal Director.
d. Finance, postal and war bond officers are prohibited from accepting any application for transmission (which include instruments payable to the applicant) or conversion unless compliance with the pertinent foregoing provisions has been had.
4. U.S. official sources, as used herein, are defined as including only monies derived, directly or indirectly, from pay and allowances or monies imported from the zone of interior.
*800 5. Effective on or about 1 November 1945, a new system of currency control of exchange and transmission of private funds will be established. All personnel are urged to convert accumulated pay and allowances and other money derived from U.S. official sources in excess of current needs, into personal transfer accounts, savings deposits or war bonds during the month of October 1945. It is recommended that all such excess private funds be converted into U.S. dollar instrumen-talities by the methods cited rather than held in foreign currencies or deposited or invested in foreign banks or ■institutions.
g * *
(2) Under the provisions of par. 3c of letter quoted above, Finance Officers will be governed by the following instructions in making conversions for personnel defined in above-mentioned directive:
(a) Conversions of currently legal tender currency of one country for currency in current use of another country will be made only when amounts presented for conversion by the individual indicate that such amounts were derived from U.S. official sources as defined in the above mentioned USFET directive. Each individual will be required to sign a certificate (in roster form if desired) certifying to the above-mentioned facts. Finance Officers will require the presentation of travel orders, when deemed necessary, to establish authority for possessing certain currencies. If amounts deemed excessive are presented they will not be accepted until an investigation has been made to determine the source of the funds. In such cases a certificate from the individual’s commanding officer will be required indicating that the statement of the individual has been investigated and it has been determined that the funds were derived from U.S. official sources.
21. Prior to and during the time in 1945 that plaintiff operated its Berlin radio station, there was in effect Executive Order No. 8389 of April 10, 1940, as amended, regulating transactions in foreign exchange, the program with respect thereto being administered by the Foreign Funds Control Division 'of the Treasury Department. In the exercise of its foreign funds control program, said Department was empowered to issue licenses to engage in foreign exchange transactions.
22. On or about November 1, 1945, plaintiff instituted at its Berlin radio station, in addition to its other service, a *801 service of a type often provided by communications companies, whereby Allied military personnel and authorized Allied civilians in Berlin could place orders in Berlin for the delivery of flowers in the United States.
23. A person placing a flower order made a single payment in Allied military marks to plaintiff in Berlin for the message accompanying the flower order to the United States, for the cost of the flowers ordered, and for the radio message forwarding such order to the United States. Payment was computed at the rate of ten marks for each dollar to be paid to florists in the United States (for flowers and any message charges within the United States) and ten marks for each dollar of message charges from Berlin to the recipient of the flowers in the United States. As set forth in finding 20(e), the conversion rate was that in use by the Allied military forces for pay and accounting purposes, and it had been used previously by plaintiff’s stations operating in Germany. At the commencement of the service’s operation, plaintiff collected a small additional charge to cover the cost of a telegram forwarding the ordering information from New York City to the city of delivery. This charge, however, was dropped after a few days.
24. Plaintiff arranged for flower and message delivery within the United States through a contract with a wholesale florist in New York City.
25. Plaintiff transmitted each flower order by means of a radio message from Berlin to the United States and in the United States forwarded such order by wire. Plaintiff made or accrued a dollar payment to the florist in New York City for execution of the flower order, including any domestic message charges within the United States.
26. (a) Plaintiff undertook the flower service for competitive reasons and to generate a larger volume of business on the circuit with Germany. It expected to profit from the revenues from the radio messages sent from Berlin and Nürnberg transmitting flower orders for delivery in the United States. Shortly after plaintiff initiated the flower service, Mackay Eadio and Telegraph Company also instituted such a service. The third communications company in Berlin, Press Wireless, Inc., limited its activities to press *802 traffic and, consequently, did not engage in any such activity.
(b) No profit or loss was expected from the cost or price of the flowers themselves (hereinafter sometimes called the “flower principal”) as plaintiff expected to be reimbursed for the dollars it paid to the florists in the United States upon conversion of the Allied military marks into dollars in an exactly equivalent amount. No charge was made for forwarding the amount of flower principal to florists in the United States.
27. Shortly after commencing operations in Berlin in July 1945, plaintiff commenced receiving inquiries from service personnel in Berlin about the possibility of establishing a flower order service. However, because of the restriction, imposed by censorship, on naming either the variety or color of flowers in radiograms, the institution of such a service at that time was not possible. However, with the lifting of such censorship in September 1945, the manager of plaintiff’s Berlin station, believing it would serve to stimulate the station’s radio transmission business, suggested to plaintiff’s head office in New York City the institution of the flower order service. Thereupon, plaintiff made arrangements with the New York City wholesale florist hereinabove mentioned to handle the business, and, envisaging no difficulties with any currency exchange problems, either with respect to the flower principal or the message tolls, by letter of October 16, 1945, authorized the manager of the Berlin station to institute the service. The letter advised of the arrangements made with the New York florist and stated that the service could commence on November 1, 1945. Plaintiff’s main office in New York City did not make any contact with the War Department in the United States regarding the contemplated flower order service.
28. Plaintiff did not receive written or oral authorization from United States military authorities to institute the flower order service at plaintiff’s Berlin radio station. As noted in finding 13, plaintiff’s authorization from the Joint Chiefs of Staff and the Board of War Communications was to “install 'a radio station and operate a direct circuit with the United States in order to handle press, facsimile, EFM, and any other commercial traffic permitted and censored by *803 military authorities.” Plaintiff assumed that the flower order service fell within the category of usual commercial traffic as used in this authorization and that it was therefore within its jurisdiction to engage in such activity unless it was objected to by the appropriate military authorities. Plaintiff was at the time making regular weekly reports to designated military officials of the type of message traffic it was handling and it felt that the appropriate authorities would thereby have official knowledge of the institution of the service. After the institution of the service on November 1, 1945, such reports listed flower transmission orders separately, and no objection or comment was made by the officials to whom such reports were submitted during the five week period it was in operation. The institution of the service was, however, generally publicized.
29. Prior to the institution of the flower order service, the manager of the Berlin station discussed the proposed institution of the service with the Army Fiscal and Finance Officer of the Berlin District Headquarters for the purpose of inquiring concerning the exchange of marks into dollars and their transmission to the United States. Plaintiff anticipated that, as a result of the institution of the service, it would have large amounts of funds for transmission to the United States. Up to that time, the marks plaintiff had been accumulating in Berlin provided no surplus over plaintiff’s current expenses in Germany and were, therefore, not sufficient for transmission to the United States. In accordance with the arrangements made for the establishment of branch unit offices by plaintiff and the purchase of postal money orders for marks, as set forth in finding 19, plaintiff felt it already had authorization to convert marks into such postal money orders and then send such orders to the United States. Although, as stated, plaintiff had not as yet made any such purchases of such money orders, transfers of funds had been made on behalf of the Mackay Company pursuant to such arrangements. However, the obtaining of postal money orders was extremely time consuming, because of the long lines at the money order windows, and plaintiff therefore preferred, in the interests of the efficient conduct of its business, to bring its marks to the Finance Officer for trans *804 mission to the United States. At tills time, however, the Finance Officer advised plaintiff’s manager that, regardless of past practices, no further conversions of marks to postal money orders would be made for plaintiff or Mackay Radio, whether it be for regular messages or flower service orders, until Treasury licenses authorizing such conversion were obtained by the companies. He stated that, in his opinion, Army facilities could not be utilized for transmitting funds arising out of commercial transactions as the system was intended for Army personnel and civilians 'assigned or attached to Army installations. He stated, however, that he would refer the matter to the Fiscal Director’s Office in Frankfurt. Despite the statement of the Finance Officer that no conversions of currency would be permitted without a Treasury license, plaintiff nevertheless instituted the service on November 1, 1945. However, plaintiff’s manager immediately requested plaintiff’s main office in New York City to obtain the necessary Treasury license.
30. At the request of United States military authorities, plaintiff had established and operated similar radio communication facilities in Italy and France before it established any radio station in Germany. It had been able to convert into dollars other currencies collected in the operation of its facilities in Italy and France, either through the purchase of dollar postal money orders from the United States Army post office or by fund transmission through the United States Military Finance Office. However, no flower order service was established in these countries. On November 1, 1945, plaintiff also instituted a flower order service at its radio station at Vienna, Austria, and plaintiff was subsequently permitted to convert into dollars, from time to time as collected, the occupation schilling received by it when orders were placed in Vienna for flowers to be delivered in the United States. Such conversion was effected through United States Army facilities.
31. Shortly after the initiation of the flower service in Berlin, plaintiff, on its own initiative, placed a $25 limit on flower purchases. This action resulted from the purchase, on the first day of the service, of a $100 orchid to be delivered to a small town in Arkansas. In addition, plaintiff’s *805 home office in New York City advised the florist handling the service in the United States that, in the event the recipient of the flowers expressed preference for a cash refund instead of the flowers, under no circumstances was such a refund to be made since plaintiff felt such action would be illegal.
32. Since, as set forth in finding 29, plaintiff was advised that the conversion question was being referred to Frankfurt, plaintiff’s Berlin manager pursued the question further with the Signal Corps Fiscal Director’s Office in Frankfurt. The Signal Corps was generally charged with the supervision of the transactions of the American communications companies in Germany. Plaintiff’s manager was advised that there was no authority for plaintiff to transmit money to the United States through the Army’s facilities. At that time, plaintiff had already accumulated considerable flower order principal and requested the Signal Corps’ help in transmitting the money out of Germany, but it was advised that to do so would be illegal.
33. Upon being advised of the difficulties its Berlin office was having in obtaining permission to convert the murks it was accumulating, representatives of plaintiff and the two other communications companies in Berlin conferred, on November 14, 1945, at the State Department in Washington, with representatives of the State, Treasury, and War Departments regarding the conversion of the companies’ marks held in Germany. The companies were given no assurances at this meeting with respect to conversion.
34. Under date of November 16, 1945, plaintiff executed an application on the prescribed form to the United States Treasury Department for a license to transmit funds accruing to it in Germany to the United States. Such application was submitted to the Treasury Department on November 19,1945, by the following letter:
Referring to your recent talk with our Mr. Cearley, we attach our application No. 35 in which we request permission to have funds transmitted to us which have been accruing in Germany as the result of the operation of our radio circuit between New York and Berlin. The station in Germany operated by our own personnel was established at the direct request of the United States *806 Military Authorities to facilitate the transmission of U.S. Government, Press and Troop messages between Germany and the United States.
In a recent message, our Manager in Berlin advised that there is now available for transfer approximately $130,000.00. That figure is being increased at the rate of $50,000.00-$60,000.00 per week through the inauguration of a new service for the delivery of flowers to any point in the U.S. Of the latter figures, the greater part must be paid out by us to florists within the U.S.
With such substantial amounts accruing at the rate stated above, you can readily understand our desire to have them released as quickly as possible.
Anything you can do to hasten approval of the license will certainly be appreciated.
The application stated that plaintiff desired to:
Transmit funds accruing to the Company in Germany from the operation of its radiotelegraphic communication service between Germany and the United States. This communication service was established at the request of the United States Military Authorities and is authorized by License #Tl-SA-355 of the Federal Communications Commission for the transmission of U.S. Government, Press, and Troop Messages between the United States and Germany. Applicant is able only partially to utilize these funds in Germany and accordingly desires to transfer them to the United States.
35. The Treasury Department refused to pass on the issuance of the requested license without receiving prior favorable recommendation from United States military authorities and referred the matter to the War Department. That Department requested the recommendation of the Commanding General, United States Forces, European Theater (hereinafter sometimes referred to as “CG, USFET”).
36. Plaintiff was unable to obtain any assurance from Government officials in Washington regarding the ultimate conversion of the Allied marks into dollars. The reference of the question by Washington to CG, USFET, took place on or about November 30, 1945, and plaintiff’s head office in New York City ordered the termination of the flower service in Berlin on or about December 6,1945, at which time the service was terminated. Thus, plaintiff’s flower order service in Berlin was in effect only about five weeks.
*807 37. In its investigation of the matter, and in requesting the recommendation of CG, USFET, as set forth in finding 35, the War Department, in a communication to the Chief Signal Officer in Frankfurt, Germany, in February 1946, requested that the communications companies operating in Germany supply certain information, including the answer to the following question:
Did the Company fully understand when entering into the personal communications field that the marks accepted were valueless unless converted and that conversion was a company problem with no obligation upon the Army?
38. Plaintiff filed tariffs in 1945 with the FCC in connection with the communications service, other than the flower service, provided by it between Germany and the United States during that year.
39. No license by the Treasury Department to convert any Allied military marks from any source whatsoever was issued until June 11, 1946, when a license was issued to plaintiff pursuant to the application dated November 16, 1945, referred to in finding 34, but which limited the conversion of marks as follows:
You are authorized * * * to transfer from Germany to the United States, funds accruing from your operations in Germany, provided the Allied Military marks involved in this exchange transaction shall be in such form and in such amounts, and shall be held exchanged, converted and disposed of at such times and in such manner as may be prescribed by the War Department and the Commanding General USFET.
40. (a) By letter of June 10,1946, from the War Department’s Chief of Finance, plaintiff was advised as follows:
This is in further reference to your request for conversion by the War Department of Allied Military mark revenues which have accrued in Germany to your company.
Thorough investigation of this matter has disclosed that certain United States commercial companies were authorized by the Joint Chiefs of Staff and the Joint Communications Board to “install a radio station and operate a direct circuit with the United States in order to handle press, facsimile, EFM, and any other com *808 mercial traffic permitted and censored by military authority”. It was further provided that this procedure should be effected “as soon as practicable after occupation of a country by United States Forces, alone or in conjunction with Allied Forces”. The Federal Communications Commission accordingly issued licenses for such operations in the European Theater and tariffs were filed with the Federal Communications Commission for the foregoing types of messages; however, insofar as can be ascertained no provision was included in these directives as to the method of payment to be employed in any particular country or area. Although no tariffs were filed for flower order transmissions, such transmissions were evidently accepted as commerical traffic in the United States on the assumption that they had been approved by appropriate military authority in the European Theater.
In view of the foregoing, the War Department, assumes responsibility for the establishment by United States commercial companies of facilities whereby authorized personnel in the European Theater could send Expeditionary Force Messages and Sender’s Composition Messages to the United States. Therefore, with the following qualification, the Commanding General of the European Theater has been authorized to effect exchange of the Allied Military marks thus accumulated in Germany by your company from the foregoing types of messages. However, it is considered reasonable that there should be withheld from conversion a supply of marks that could normally be used for local expenditures in Germany for a period of one year from settlement date, based on current operating expenses. Consequently, the Commanding General of the European Theater has been advised that deduction of such an amount should be made from that portion of your Allied Military mark holdings which represent message tolls. Decision will be made by the Theater Commander as to whether flower order transmissions to the United States were authorized by appropriate Euro-
Kean Theater authorities, and conversion of the Allied [ilitary marks derived from transmissions of this type will or will not be effected depending on his decision in this matter. Insofar as is known here, flower order transmissions from Germany to the United States were not authorized by the War Department and apparently this type of service was discontinued in December 1945 when the currency conversion problem became acute.
It has been recommended to the Commanding Gen *809 eral of the European Theater that local directives be revised at the earliest practicable date to prohibit direct payment in a foreign currency to United States commercial companies for message transmissions and that a procedure be established involving the use of dollar instruments, thereby obviating the necessity for any subsequent conversions of foreign currency. The Theater Commander has been requested to ascertain from representatives of the United States communications companies in Germany the aggregate amount of Allied Military marks for which conversion is desired. On the basis of these data and with the deduction of an estimated one year’s currency needs for operations in Germany, conversion of the remaining Allied Military marks representing message tolls should be effected without further delay. Of course, the conversion of those Allied Military marks secured for flower orders will be dependent upon the decision made by the Commanding General of the European Theater, who will advise your representative in Germany of his views on this phase of the problem.
It is understood that your company has already filed an application with Foreign Funds Control, Treasury Department, for a license to permit the conversion into dollars of your Allied Military mark holdings, and the War Department has been assured by representatives of Foreign Funds Control that no further delay should be encountered relative to the issuance of this license,If there are further questions which you may wish to raise in regard to this matter, the War Department will be glad to consider them; however, implementation of the foregoing policy will be effected in the European Theater and it is believed that your representative in Germany will be in a position to keep you advised of any subsequent developments. It is trusted that the contemplated settlement will be acceptable to your company and that the problem of future financial arrangements will be simplified accordingly.
(b) On June 19, 1946, at the request of plaintiff and the Mackay Company, a conference was held at the Office of the Chief of Finance, War Department, concerning the conversion of the marks which the companies held. The companies were advised of the European Theater Commander’s concurrence with the War Department’s position relative to the conversion of the marks held as a result of Expeditionary Force messages (EFM) and senders composition mes *810 sages (SCM), except for a one year’s operating supply of marks, as set forth, in (a) above. However, they were also advised of the Theater Commander’s decision that there would be no conversion of marks held by the companies as a result of flower type transmissions.
The companies thereupon requested reconsideration of the War Department’s and the Theater Commander’s position concerning the flower principal marks. In support of their request for reconsideration, the companies stated that they were given the impression that the War Department itself would finally decide the matter, and not the Theater Commander; that, while they frankly admitted the nonexistence of any specific written authorization for the flower type transmissions, nevertheless this service was requested by the American Red Cross, and the initiation of the service was for troop-morale purposes; that the Joint Chiefs of Staff’s authorization in effect constituted authorization for the flower type transmissions as all traffic was censored by the military authorities and there was, therefore, indirect and implied approval of the Army because the Army did not stop the messages through its censorship facilities; that Army sponsored and controlled facilities, such as Post Exchanges, were the agencies that accepted orders and payment in marks for flower type transmissions; that Army personnel employed therein approved of the transmissions, that this indicated Army approval, and, in plaintiff’s opinion, obligated the War Department to convert the marks into dollars; and that specific tariff registrations with FCC for flower type transmissions were not necessary since the actual messages sent, although directing the purchase of flowers, were only of the sender’s composition type authorized in tariffs already registered.
In reply, the War Department officials stated that the Department itself had been definite in its decision not to permit conversion of marks resulting from flower transmission revenues but that nevertheless, in fairness to plaintiff and Mackay, the Department allowed the Theater Commander to make the decision based upon whether either direct or indirect authorization could be found within the theater for the transmissions; that the Red Cross was not a part of the *811 War Department and was not authorized to request such services, even for morale purposes; that Army censorship was for intelligence purposes only and administrative stoppage of the messages through this medium could not be expected ; that any participation in the service by personnel of the Post Exchanges or other Army personnel was voluntary, and was for the purpose of providing a centralized locality for the convenience of the companies; and that, although the flower transmission message was, in itself, a sender’s composition message, the message actually effected a remittance of money to the United States and a conversion of marks into dollars which were circumventions of currency exchange controls.
The War Department officials stated, however, that any further information presented by the companies would receive the Department’s consideration. The companies stated that they wished to investigate the matter further and that they would then present a written request for reconsideration. However, the Department’s officials indicated that, insofar as authorization of the flower type service was concerned, consideration could only be given to authorizations given by proper authority, and that the Department could not consider an approval of the service given by any individual not duly authorized to give such approval.
(c) By letter of July 24, 1946, plaintiff was further advised by said Chief of Finance:
Eeference is made to letter this office dated 10 June 1946, relative to your request for conversion by the War Department of the Allied Military mark revenues which have accrued in Germany to your company as a result of EFM, SCM, or flower type transmissions.
The Commanding General, U.S. Forces, European Theater, has notified the War Department that the conversion of the Allied Military marks which have accrued to your company as a result of flower transmissions from Germany will not be effected and that your representative in Germany will be advised accordingly. The War Department concurs in the theater commander’s decision.
It is understood that the Commanding General, U.S. Forces, European Theater, will authorize the conversion of Allied Military marks which accrue to your company *812 in Germany as a result of the EFM and SCM type messages filed subsequent to 30 June 1946.
(d) On August 13,1946, the Office of the Fiscal Director, TJSFET, authorized plaintiff, in accordance with the above determinations, and pursuant to its Treasury license, to present for conversion, through Army facilities, 598,734.70 Allied military marks. No conversion of flower principal was authorized.
41. On December 18, 1946, the FCC sent plaintiff the following letter:
It has come to the Commission’s attention that R.C.A. Communications, Inc. may be engaging in a so-called “flower order service” made available to the U.S. armed forces in certain European countries whereby the Company forwards by telegraph orders for the delivery of flowers to points in the United States. However, the tariffs of RCAC now on file with the Commission do not appear to contain regulations and charges applicable to such service. _
_ Please advise.
On January 9, 1947, plaintiff replied as follows:
*****
Flower Service is available from both Austria and Germany to the United States but Flower Order mes-ages are charged at the Ordinary commercial rates published in our tariff F.C.C. No. 39, according to the class of telegraphic service desired by the sender. RCA Communications, Inc. acts merely as the transferee of the money deposited by the sender for the purchase of flowers within the United States, the same as Reply Paid (RP) tolls are handled. This service was inaugurated at the request of the military people in Europe.
We observe that on 1st Revised Page 15 of the joint tariff of All America Cables and Radio, Inc., the Commercial Cable Company and the Mackay Radio Telegraph Company, that reference to this service has been made. We are taking steps to make a similar addition to the rules and regulations in our tariff F.C.C. No. 39 on statutory notice. We trust that this will meet the requirements of the Commission.
On January 13, 1947, plaintiff submitted the following letter to the FCC:
In accordance with the requirements of the Communications Act of 1934, as amended, we are filing herewith *813 the following revised pages to our Tariff F.C.C. No. 39 to become effective February 15,1947 * * *

Reasons:

To establish Flower Order Service from military personnel in Austria and Germany to the United States at request of the military authorities.
Attached to the letter were data relating to the submission, in which was stated the following:
Floioer Order Messages from Ü.8. Armed Forces in Austria and Germany—
Flower Order messages are accepted from personnel of the United States armed forces in Austria or Germany. Such messages are addressed RADIOFLORA NEW YORK and are delivered to a reputable florist in New York, N.Y. for execution of the order.
The sender of a Flower Order message pays the rate per word to New York, N.Y. for the class of service selected, plus the amount to be expended for flowers (not less than $3.00), the latter amomit being paid by the Company to the New York florist entrusted with the order.
There is no additional charge for placement of the flower order nor for the execution of same.
42. (a) On October 16, 1947, plaintiff sent a letter to the Secretary of the Army which stated in part as follows:
Reference is made to the request of RCA Communications, Inc., for conversion by the Army Department of Allied Military Marks which had accrued to that company as a result of Flower Order transmission for members of the United States Armed Forces in Germany, * * *
There appears to be an impression among some of the Army officials that this service was used to convert Marks into dollars and thus circumvent the currency control then in effect in Germany. Consequently, RCA Communications, at their own expense, had the matter carefully investigated. On May 9, 1947, our attorneys, Cahill, Gordon, Zachry & Reindel, forwarded to Lieutenant Colonel Edwards an affidavit of William Harris, Vice President and Treasurer of M. Goldfarb — My Florist, Inc., the firm which handled the actual flower order delivery in this country, establishing that not one penny was paid out in cash in this country on flower orders and that in each case there were either flowers, actually delivered or that the order was canceled and the money *814 returned to the sender overseas in the same currency in which he had originally paid.
* $ ‡ $
The Authority of RCA Communications, Inc., to establish this service stemmed from the Joint Chiefs of Staff, who authorized the TJ.S. radiotelegraph carriers “to install a radio station and operate a direct circuit with the United States in order to handle press, facsimile, EFM and other commercial trafic permitted and censored by military authorities.” [Italics supplied] Flower delivery service is one of the standard types of commercial traffic recognized and provided by telegraph, radio and cable companies throughout the world. There can be no reasonable question that it was “permitted” by the military authorities as weekly reports of the business were submitted to the Adjutant General, USFET, and never questioned, and the military authorities protested when the service was discontinued by the Company. Censorship was lifted before the service was established.
Acting entirely in good faith, with the authority of the highest military headquarters, the JCS, without asking any questions, without seeking to extract any written commitments, guarantees, or contracts to protect itself for the future, RCA Communications, Inc., undertook to furnish to the United States Armed Forces Overseas rapid and dependable communications with home. We realize now that we might have been better advised to proceed with caution and demand protection in the form of a contract, but it is not the practice of RCA Communications to seek to protect itself against its government.
On the basis of the above directive, RCA Communications, Inc., made extensive expenditures of time and money and technical and administrative personnel to fulfill its mission as authorized by the Joint Chiefs of Staff to provide for the United States Armed Forces in Europe the tie with home so essential to the maintenance of troop morale. It is true that the War Department never committed itself directly to compensate RCA Communications, Inc., for its services rendered to American troops. There is no doubt that legally it could have done so. Instead, the decision was made to let the individual soldier send the message and pay for it himself, just as he paid for the articles he bought in the PX, just as the officer paid his mess bill, just as officer and soldier alike paid their bills for laundry, cleaning of clothes and *815 refreshments. For all practical purposes the radiotelegraph carrier serving the United/ States Armed Forces in Europe was, and to this day still is, a member of the official family under military supervision furnishing the services which the War Department and the military authorities in Europe consider essential for the individual welfare and morale of United States troops and accredited civilian personnel fulfilling their mission in the performance of occupation duties in Germany.
The type of traffic handled by ECA Communications, Inc., out of Berlin has always been, and presently is, under the control of the military authorities there. Ee-ports were required and regularly made to the appropriate military authorities as to the traffic being handled, its volume and type broken down in classes.
Throughout the operation of the Berlin-United States circuit, it was known both to the War Department officials in Washington and to the military authorities in Europe that the only kind of revenue available to the American radiotelegraph carriers from the German end was in Allied Military Marks paid by the individual senders of the messages.
The initiation of the flower order service was thoroughly publicized in Berlin and was made, the subject of news releases both in the European Edition of Stars and Stripes and in American newspapers. It was specifically identified and its volume set forth in regular weekly reports made to the proper military authorities. If there was anything improper about furnishing flower order transmission service to the United States Armed Forces in Europe, it lay completely within the power of the military authorities so to advise ECA Communications, Inc., prior to the inception of that service, or to stop it after it was first reported.
ECA Communications, Inc., is fully aware of the difficulty raised by failure to reach agreements with the Soviet Union as to conversion of Allied Military Marks printed 'by the Soviet Union into dollars. ECA Communications, Inc., is also aware of the testimony of Assistant Secretary of War Howard C. Peterson and Major General George J. Eichards, Director of the Budget, given before the Appropriations, Armed Services and Banking and Currency Committees of the Senate on June 8, 1947, stating that the Army redeemed some $380,000,000 of Allied Military Marks currency in excess of the appropriated firnds. It is perfectly natural *816 that the Army Department would not be inclined to increase that amount. However, it is equally obvious that the failure of the War Department to convert the Allied Military Marks accruing to ECA Communications, Inc., as the result of the flower order transmission would amount to a gross and unjust discrimination against one of the many army services available to United States Armed Forces Overseas, simply on the ground that this particular service was furnished by a patriotic private radiotelegraph carrier rather than some directly controlled agency, such as the PX, commissary, officers’ club, etc. All of these agencies furnished services which involve the expenditure of dollars against revenues in Allied Military Marks. These Marks were converted into dollars by the military authorities. The Marks received by ECA Communications were also converted into dollars, with the sole exception of the flower order principal received in Berlin. The message tolls, including the flower order messages filed in Berlin, were all converted into dollars, and the flower order principal received in Vienna and Nuremberg was converted into dollars.
ECA Communications, Inc., never concealed from the military authorities any facts as to the services it furnished or proposed to furnish to the United States Armed Forces abroad. Eelying implicitly upon the Joint Chiefs of Staff Directive that it was authorized, to furnish any commercial service 'permitted by the military authorities, it felt that it had observed all the necessary regulations as long as it so disclosed to the military authorities the type of service it intended to furnish, and was permitted to furnish that service without objection by competent military authorities.
At this late date for the War Department or the military authorities in Europe to pick this one type of service for which it will not convert from Allied Military Marks into dollars, having originally knowingly permitted such services to be rendered without objection, is a poor recompense indeed to the American radiotelegraph carriers for their willing cooperation with the War Department during and after the war in giving U.S. soldiers overseas the services they needed.
This is not a case in which ECA Communications, Inc., seeks to realize a profit or even payment for services rendered. This is a case where, in reliance upon the good faith of the military authorities in Europe, *817 ECA Communications, Inc., ont of its own funds, advanced tlie sum of $307,339.76 to American florists to pay for flowers ordered by American soldiers overseas. These soldiers paid in the only currency they had— Allied Military Marks. At the time such payments were made there were neither regulations nor restrictions forbidding them. The only currency control was against conversion of Allied Military Marks into dollar instruments. Since not a single flower order was ever converted into dollars, there was no distinction whatever between a soldier’s buying a $25 watch in the PX in Berlin for 250 Marks and sending it home and a soldier’s buying a $20 flower order for 200 Marks in Berlin and ordering it to be delivered in the United States.
Sc * * * *
It [ECA Communications,. Inc.] merely requests in all fairness to be considered in the capacity in which it actually served the United States Armed Forces Overseas, that is, as one of the official family brought in and supervised by the Army to furnish the American troops the personal and individual services essential to the maintenance of their welfare and morale, and to exchange for dollar funds the Allied Military Marks which these troops paid.
We ask that you have this matter reviewed and a decision made in the light of justice and the good faith and integrity of the Army rather than in a spirit of technicality and legalism, which unfortunately appears to have crept into it.
(b) On February 3, 1948, the Secretary of the Army, in reply to plaintiff’s letter of October 16, 1947, advised:
The entire matter has been thoroughly reviewed and it has been determined that the Army is under no legal or other obligation to convert into dollars the marks in question.
In view of the foregoing, the Department of the Army must deny your request for exchange.
43. In 1945, plaintiff received 1,233,413.90 in marks in payment for messages transmitted from its radio stations in Germany, including the message charges for flower orders, but excluding the flower order principal. During 1945 it expended Allied military marks as follows:

*818

44. In connection with the flower service plaintiff collected during the five-week period from November 1 to December 6, 1945, and received 3,078,397.60 Allied military marks in Berlin as payment for flowers (as distinguished from payment for radio messages forwarding such flower orders, which mark amounts are not included in said figure) and plaintiff in 1945 paid or accrued amounts totaling $307,339.76 (at the rate of one dollar to ten Allied military marks) as owing to United States florists for the execution of flower orders transmitted from Berlin. In addition, plaintiff received in 1945 329,124.10 Allied military marks for the messages transmitting the flower orders from Berlin to New York City and 16,874.80 Allied military marks for forwarding such orders from New York City to their ultimate destination. Such marks were also paid and received on the basis of ten marks for each dollar of message charge. Plaintiff paid or accrued in 1945 amounts totaling $1,687.48 at the rate of one dollar for ten Allied military marks for forwarding the flower orders in the United States.
45. In its income and excess profits tax returns for 1945, plaintiff reported all of its mark receipts as gross income at the rate of ten marks to the dollar, except that it did not report as income the flower marks or the amounts received to be paid for forwarding flower orders from New York City *819 to their ultimate destination. Defendant concedes that plaintiff correctly included no amount in gross income or in excess profits net income in its excess profits tax return for 1945 in respect of the Allied military marks collected in Berlin in 1945 for flowers to be delivered in the United States. In its returns, plaintiff claimed as a deduction $31,757.06 for expenditures made in Germany in connection with the operation of its stations at the rate of one dollar for ten Allied military marks expended. It neither deducted nor included in its cost of operations the $307,339.76 paid or owing to United States florists for flower orders and the $1,687.48 paid for forwarding such orders in the United States.
46. (a) Plaintiff’s general accounting procedure in connection with its flower order services, including its 1945 Berlin flower order service, has been to have plaintiff’s office placing a flower order with a florist for execution (executing office! make an internal bookkeeping entry debiting the amount paid or payable to the florist to the office which had forwarded the flower order after receiving it from the customer (forwarding office). When the amount in dollars of the order is received by the executing office from the forwarding office, the executing office credits the forwarding office, thus canceling the debit.
(b) The accounting treatment given to the flower mark amounts on the books of plaintiff did not affect its reported taxable income for 1945 or any subsequent year. Said accounting procedures and entries have been reviewed and approved by a firm of public accountants, and have also been reviewed, without objection, by auditors of the FCC. Both the procedures and entries represent accepted and accurate accounting practice.
47. In 1945, plaintiff’s New York office as executing office debited its Berlin office as forwarding office in the total amount of $307,339.76 in respect of amounts paid or payable to United States florists in that year. In 1946, plaintiff’s New York office debited its Berlin office in the amount of $4,045 in respect of amounts paid or payable to United States florists in 1945 for execution of flower orders forwarded from plaintiff’s Nürnberg station in 1945. Plaintiff’s New York office never received the dollar amounts thus debited to the *820 Berlin office and tliis charge against the Berlin office was subsequently disposed of as set forth in finding 49.
48. At December 31, 1945, and at December 31, 1946, the amounts of $307,339.76 and $311,384.76 were not classified as cash in the balance sheet of plaintiff for the reason that the “flower marks” were not convertible to United States currency and therefore could not be included in cash on hand or in banks.
49. In December 1947, the plaintiff debited delayed income charges and credited allowance for uncollectible receivables with the amount of $214,476.06. Said amount represented the provision to write off $311,384.76 paid or payable to U.S. florists for 1945 German flower orders plus $28,091.30 for traffic marks not yet converted into dollars, less $125,000 estimated excess allowance for uncollectible receivables. The amount of $125,000 represented, in effect, a 1946 book transfer from the reserve for investments (a nondeductible surplus reserve) to the allowance for uncollectible receivables. In the same December 1947 journal entry, plaintiff credited account receivable — Berlin office and debited allowance for uncollectible receivables in amount of $311,384.76. At the same time, the plaintiff set up an account receivable from the United States Government in amount of $224,197.03, representing a claimed refund of 1945 excess profits taxes computed at 72% of the $311,384.76 paid or payable to United States florists. The corresponding credit in the amount of $224,197.03 was to delayed income credits.
50. The flower marks were initially retained in plaintiff’s Berlin office. On October 23,1946, when such facilities first became available, plaintiff rented a safe deposit box in the Berliner Stadtbank in Berlin and placed the flower marks in the vault of said bank. On April 29, 1948, they were withdrawn and placed in the vault of a branch of The Chase National Bank in Frankfurt. West German currency reform became effective as of June 21, 1948, and on June 25, 1948, the marks were withdrawn from The Chase National Bank and, in accordance with instructions from the Office of the Chief of Finance, Headquarters, European Command, were turned over to Landeszentralbank von Hessen in *821 Frankfurt where they remained until conversion into Deutsches mark, as hereinafter set forth. Insofar as physical handling of the actual marks was concerned, the flower marks were treated by the plaintiff in exactly the same way as the traffic marks.
51. Under Regulation No. 1 of the Allied Bank Commission, effective November 1, 1948, issued under Law No. 65 of Military Government for the United States Area of Control in Germany, plaintiff’s marks, including the flower marks, were exchangeable into Deutsches mark at the rate of 6% Deutsches mark for 100 Allied military marks. The new Deutsches mark had an official exchange rate of $0.30. At the time of the conversion of the original Allied military marks, into Deutsches mark, the entire amount to be converted, including the flower marks, was held in a time deposit bank account and earned interest at the rate of 21/2 percent per year. This interest was added to the principal for purposes of conversion. On December 12,1948, the Allied Bank Commission authorized the conversion into Deutsches mark of plaintiff’s balance of marks, including the 3,113,836.60 flower marks collected in 1945. By letter dated January 10, 1949, Landeszentralbank von Hessen advised plaintiff that there was received from the conversion 202,399.37 Deutsches mark, of which 15,569.18 were booked in a special account, plus interest from June 21, 1948 to December 31, 1948, in the amount of 204.35 Deutsches mark at the rate of 2y2 percent per year. In September 1949, the Deutsches mark was devalued to an official exchange rate of approximately $0,238. Thereafter, beginning in November of 1949, interest accrued and was credited at annual rates ranging from 2% to 3 percent, depending upon the nature of the deposit.
52. In November 1949, plaintiff commenced utilizing its Deutsche mark bank balance in Germany, including the former flower marks, for the payment of operating expenses incurred in Germany, and by September 30, 1955, all such marks had been expended.
53. Interest received on Deutsches mark balances has been included by plaintiff in gross income in its Federal income tax returns. Expenditures of Deutsches mark stemming from the flower marks in payment of expenses in Germany *822 have not been reflected in gross income in plaintiff’s Federal income tax returns.
54. (a) Timely protective claims for refund in respect of the flower marks have been filed by plaintiff for the calendar years 1946, 1947, 1948 and 1949. No action has yet been taken by the Internal Revenue Service on any of these claims.
(b) The claim for refund referred to in finding 6 stated in pertinent part as follows:
Upon the cessation of hostilities in Germany in 1945 the taxpayer,_ with appropriate authorization, established a radio station in Berlin to send and receive radiograms between the United States and occupied Germany. In this connection the taxpayer instituted a service, of a type common in the United States, whereby Allied Military Personnel and authorized civilians in Berlin could place orders in Berlin for the delivery of flowers in the United States. Payments for flowers were made to the taxpayer in Berlin in Allied Military Marks, at the rate of ten such marks for each dollar to be paid by the taxpayer to florists in the United States.
Each flower order was placed by means of 'a radio message and the taxpayer undertook to make dollar payments to florists in the United States because of anticipated profits from the revenues received in connection with the radio messages which accompanied the flower orders.
U.S. Army authorities have been in exclusive control of the conversion of Allied Military Marks into dollars or any other currency, and such authorities in 1945 and subsequently took the position that the taxpayer has had no lawful or other right to convert the Allied Military Marks received for the purchase of flowers.
Such Allied Military Marks were worthless at the time of their receipt by the taxpayer in 1945. At such time and at all times thereafter during 1945 there existed no lawful means by which the taxpayer could convert such Allied Military Marks into dollars or into any other currency (whether or not convertible into dollars) , or into any other property.
In connection with its flower service, which was terminated on or about December 12, 1945, the taxpayer during the calendar year 1945 made payments totaling $311,384.76 to United States florists or orders placed in Berlin. These payments were charged by the taxpayer *823 to its Berlin office. They were not reflected in the taxpayer’s income tax or excess profits tax returns for the calendar year 1945, as the taxpayer regarded itself merely as a conduit for the payment of United States florists by the flower senders in Berlin. No deduction for this item has been taken in the taxpayer’s income tax return for any later year.
The revenues from the radio messages which accompanied the flower orders were included in gross income in the taxpayer’s returns for 1945.
The taxpayer erroneously overstated its income subject to excess profits tax for 1945 by failing to deduct from gross income the sum of $311,384.76. Such amount was deductible under either Section 23(a)(1) (A) or Section 23 (f) of the Internal Eevenue Code.
55. Absent a Treasury license, at no time during 1945 did there exist any lawful means by which plaintiff could have converted the Allied military marks into dollars or transmitted the funds to the United States under the existing restrictions imposed by military authorities. Except as to their interchangeability with the reichsmarks in the German economy, plaintiff could not have converted the marks into any other currency (whether or not convertible into dollars) in view of the restrictions imposed, nor could plaintiff convert the marks into any other property in occupied Germany, or remove or invest any currency held by it in occupied Germany. The Allied military mark was not a currency of or an obligation of the United States or any agent thereof. There was no established general rate of exchange or conversion for the marks into United States dollars. Absent approval by the appropriate officials, Army fiscal facilities could not be used for the transfer, exchange or conversion of the marks accumulated by plaintiff as flower order principal. There were no banking facilities, either military or civilian, American or otherwise, which plaintiff could have used to convert, exchange or transfer the marks.
CONCLUSION OP LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover with interest thereon as provided by law, and judgment will be entered to that *824 effect with tbe amount of recovery to be determined pursuant to Rule 38 (c).
In accordance witb the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on July 1, 1960, that judgment for the plaintiff be entered for $224,197.03, with interest thereon as provided by law. It was further ordered on October 14, 1960, that a supplemental judgment for the plaintiff be entered for $10,531.67, with interest thereon as provided by law.